OPINION
{¶ 1} Plaintiffs-appellants, Tammy and Roger McCabe, appeal from the judgment of the Franklin County Court of Common Pleas entered upon a jury verdict in favor of defendant-appellee and cross-appellant, Leonard P. Janis, DPM.
 {¶ 2} Tammy McCabe ("Tammy") underwent surgery to her right foot on January 28, 2000 under general anesthesia at Grant Hospital located in Columbus, Ohio. The surgery was performed by podiatrist Leonard P. Janis, DPM ("Dr. Janis"). Immediately after dressing the surgical wound and while Tammy remained under general anesthesia, a polar pack was applied to her right foot with an ace bandage. After her discharge from the hospital, Tammy used the polar pack at home during her recovery without complication.
 {¶ 3} Breg, Inc. manufactured the polar pack used by Tammy. It is called the "Polar Care 300." Breg's Polar Care 300 is a continuous cold therapy device that is used following surgery to reduce inflammation and pain.
 {¶ 4} The Breg device contains a plastic pad or cuff connected to a cooler by two plastic lines. Breg's written instructions for use ("instructions") state that the cooler should be filled with ice and water and its lid locked in place. The device also contains an air pump that plugs into a standard electrical outlet. Air is pumped through a plastic line into the cooler and cold water is circulated to the pad.
 {¶ 5} Breg's instructions claim that the device provides a "controlled therapy system * * * at an optimal desired therapeutic temperature (47-50° F)." For the first three days following surgery, Breg's instructions indicate:
Use immediately post surgery as much as desired to alleviate pain. Sleeping with the device running through the night.
 {¶ 6} For the third and fourth days following surgery, Breg's instructions indicate: "Use as much as desired and to your pain tolerance."
 {¶ 7} On May 12, 2000, Dr. Janis performed surgery on Tammy's left foot under general anesthesia at Grant Hospital. A bunionectomy, condylectomy, excision of neuroma, and metatarsal ostotomy were performed. Dr. Janis' operative report of May 12, 2000 states:
* * * A postoperative injection of a total of 10 cc of a 50/50 mixture of 1% lidocaine with epinephrine 1:200,000 and 0.25% Marcaine plain were delivered to the surgical site. The wound was then dressed using betadine-soaked Adaptics, 4 x 4s, Kerlix, a polar pack was applied with an Ace bandage. * * *
 {¶ 8} In fact, the polar pack applied on May 12, 2000 was the very same Polar Care 300 device that Tammy used following her right foot surgery. Tammy decided to use the same device for her second surgery to save insurance money. (Tr. Vol. III, at 26.)
 {¶ 9} On May 16, 2000, four days after surgery, Tammy went to Dr. Janis' office for follow-up care. At that time, Dr. Janis observed that Tammy's left foot was "blanched, discolored, and cold." (Tr. Vol. II, 33.) At that time, Dr. Janis believed that Tammy had sustained "frostbite" to the left foot. (Tr. Vol. II, 34.) Photographs of the left foot were taken. Dr. Janis arranged for Tammy's emergency admission to Grant Hospital for treatment. Tammy was treated at Grant Hospital and discharged on May 20, 2000. In late November 2000, Tammy initially saw podiatrist Anthony G. Polito, DPM, for treatment of her left foot.
 {¶ 10} On May 4, 2001, Tammy and her husband, Roger, filed a negligence action against Dr. Janis in the Franklin County Court of Common Pleas. Discovery was conducted by the parties.
 {¶ 11} Because Dr. Polito was listed as plaintiffs' witness, defendant's counsel took Dr. Polito's deposition on February 21, 2003. During the deposition, Dr. Polito testified that he had recently requested a copy of patient instructions regarding polar pack use from St. Vincent Charity Hospital where Dr. Polito has privileges. The hospital faxed to Dr. Polito a copy of the patient instructions for use of a polar pack manufactured or sold by "EBIce." (Depo., at 6.) Dr. Polito testified that the request was made because he "wanted a copy of written instructions that might be given to the patient or the hospital personnel in regard to a polar pack device." (Depo., at 7.) Dr. Polito had never used the Breg polar pack in his surgical practice. He also had not seen the Breg instructions. In fact, Dr. Polito does not use any type of polar pack in his surgical practice because he believes that the risks outweigh the benefits.
 {¶ 12} When asked to identify any medical literature documenting problems that might arise with polar pack use, Dr. Polito pointed to the "EBI literature," an apparent reference to the materials published by "EBIce" that he received from St. Vincent Charity Hospital. (Depo., at 26.) He also identified two medical textbooks that have information about use of polar packs — the Podiatrist Institute Manual and McGlamry's Foot Surgery. Dr. Polito had recently performed a "Google" search on the internet regarding "cryotherapy" and was able to locate information on the Breg polar pack. (Depo., at 24.) However, he did not find the Breg website and he did not run a printout of any of his internet search results. Dr. Polito had not conducted any tests or experiments on the Breg device nor did he have any plans to do so. He testified that he felt that he had sufficiently prepared himself to render an opinion as to the standard of care allegedly violated by Dr. Janis.
 {¶ 13} Dr. Polito testified at his deposition that he was trained to treat and diagnose frostbite injuries. He defined frostbite as the "freezing of tissue." (Depo., at 38.) He stated that tissue can freeze at "anywhere between 30 and 45 degrees." Id. It was Dr. Polito's opinion that Tammy had sustained either a third or fourth degree frostbite.
 {¶ 14} When asked how cold a polar pack can get, Dr. Polito responded:
* * * [T]he polar packs, based on the amount of ice and the amount of water used, can get anywhere between 30 to 32 to 48 degrees.
Id. at 38.
 {¶ 15} Later in his deposition, Dr. Polito stated:
We know that the circulating water can certainly go as low as 33 degrees and actually be circulating.
* * *
* * * It seems logical to me that the lowest temperature would be around 33 degrees, but, again, to my knowledge, and reviewing what I reviewed, there is no temperature gauge on this device that tells us — or these other devices that tells us at a certain time what the temperature is.
Id. at 41.
 {¶ 16} Dr. Polito was asked whether he had an opinion as to what temperature on the skin the polar pack unit could generate. He responded:
I'm sure the polar pack device could generate a temperature, certainly, 33, 35, 38 degrees, in and around that temperature.
Id. at 43.
 {¶ 17} According to Dr. Polito, given that the polar pack itself was not defective and given that Tammy did not do anything differently following her left foot surgery than following her right foot surgery, "the only logical explanation" for frostbite is the Breg device was placed improperly on her foot by Dr. Janis' resident. (Depo., at 49-50.) Dr. Polito concluded that the Breg device was improperly applied to the foot because "there was, in all likelihood, not enough gauze or ply between the actual device and the skin, itself." (Depo., at 50.) According to Dr. Polito, "approximately eight ply" of gauze is necessary between the device and the skin. Id. Dr. Polito further stated:
* * * [A]ccording to his operative report, they placed gauze pad, a Kerlix, which is a wrap, the actual polar pack and more Kerlix and Ace wrap.
When I say improperly, what I mean is I do not feel, based on the result this patient has attained, there was enough of that ply between the actual polar pack and the skin, itself.
(Depo., at 54.)
 {¶ 18} During the deposition of Dr. Polito, the following exchange occurred:
Q. [Defendant's counsel] Are you going to offer any testimony as to what temperature the Breg unit can develop in terms of the water that runs through the polar pack wrap portion as applied to the wound?
A. [Dr. Polito] Well, certainly, I will be more than happy to discuss with Breg and also receive their literature on their machine that will tell us in their testing, laboratory testing, what temperatures — based on how their unit is utilized, the range of temperatures that they have.
Q. Are you going to perform any examination or experiment or testing of the machine to come up with your own data in terms of that?
A. No, and I think, you know, again, here, I think, you know, the point is this gal has frostbite. It's a moot issue as to what temperature this device works at. She didn't have the frostbite before he put that polar pack on. She now has frostbite subsequent to him putting the polar pack on. So, does it really matter what temperature that pad was?
(Depo., at 70-71.)
 {¶ 19} It was further Dr. Polito's opinion that Dr. Janis fell below the standard of care by advising plaintiff to use the Breg device "as tolerated" even if the Breg instructions state that the patient is to use the polar pack as tolerated. (Depo., at 51.) This opinion was premised upon his conclusion that the post-operative injection of a local anesthetic at the surgical wound site would have a numbing affect that" could last 12 to 16 hours." (Depo., at 52.) According to Dr. Polito, it would be appropriate or within the standard of care after injecting a local anesthetic into the wound site to tell the patient to use the polar pack:
* * * [F]or 20 minutes, or maybe an hour, turn it off for 40 or — and then if — if persistent numbness past one day, or the — the extent of whatever local anesthetic was put in the foot, I mean, to certainly stop using the device * * *.
(Depo., at 89.)
 {¶ 20} At trial, the plaintiffs' first witness was Dr. Janis who was called as on cross-examination. Dr. Janis testified he tells his surgical patients to use the polar pack to their tolerance. When he examined Tammy's left foot on May 12, 2000, he believed that she had sustained a frostbite injury. Dr. Janis agreed with counsel's statement that if the polar pack is operating properly and the pad is applied properly, the patient should not get frostbite no matter how long the device is used. Dr. Janis agreed that he had no information that Tammy had used the polar pack improperly. Dr. Janis agreed that he had no information that the polar pack itself had malfunctioned.
 {¶ 21} The second witness called by plaintiffs at trial was Dr. Polito. Citing Dr. Polito's deposition testimony, defendant moved the court to exclude portions of Dr. Polito's anticipated trial testimony. Defendant also requested a voir dire which the trial court granted.
 {¶ 22} During voir dire, it was shown that Dr. Polito possessed no reliable or authoritative information to challenge Breg's claim that its Polar Care 300 provides a temperature of 47 to 50 degrees. Nevertheless, Dr. Polito offered his opinion that the Breg device can generate temperatures "as cold as 35 or 40 or 45 degrees." (Tr. Vol. II, at 77.) He asserted that, because there is no "temperature gauge" built into the Breg unit, one cannot know the temperature that the device is delivering. Id. Dr. Polito was repeatedly asked whether he disagreed with Breg's claim that the polar pack delivers a temperature of 47 to 50 degrees and his responses were repeatedly evasive. He finally opined, somewhat disingenuously, that it would be illogical to believe that the Breg unit could maintain a temperature below 50 degrees if the cooler was not periodically refilled with ice. The opinion was obviously unresponsive to the line of questioning which was probing for the devices' capability of producing injury when the cooler was filled with water and ice.
 {¶ 23} Following voir dire, the trial court, citing Evid.R. 702, ruled that Dr. Polito cannot testify regarding the "Breg Polar Pack 300." (Tr. Vol. II, at 97.) The court further ruled that Dr. Polito would not be permitted to testify that defendant fell below the standard of care in the application of the polar pack pad to the surgical site. (Tr. Vol. II, at 100-101.)
 {¶ 24} Following voir dire and the court's ruling, the jury was called back to the courtroom and Dr. Polito was called to the witness stand by plaintiffs. Dr. Polito is a podiatrist licensed by the state of Ohio. He is board certified in foot surgery. He testified that he began treating Tammy for her foot condition in November 2000. It was Dr. Polito's opinion that Tammy had sustained third or fourth degree frostbite to her left foot.
 {¶ 25} During Dr. Polito's direct examination, the following exchange occurred:
Q. [Plaintiffs' counsel] Do you have any opinion that you have reached to a reasonable degree of medical probability based on anything that you have reviewed in this case as to whether or not Tammy McCabe in using the polar pack itself malfunctioned in any way?
A. I don't believe from a reasonable medical degree that this device malfunctioned.
Q. Do you have an opinion on everything that you know about this case whether or not Tammy McCabe misused this device in any way?
A. Again, based on a reasonable degree of medical certainty I do not believe that Tammy McCabe misused it in any way but that she used it in a way that she was instructed to do so by her physician.
Q. Do you have an opinion or have reached an opinion by a reasonable degree of medical probability as to whether or not in all probability this device was applied appropriately at the time of her surgery?
[Defendant's counsel]: Objection.
THE COURT: Sustained.
(Tr. Vol. II, at 138-139.)
 {¶ 26} During cross-examination, Dr. Polito testified that, in his opinion, a temperature of 47 degrees can cause frostbite even though the freezing point of water is 32 degrees. (Tr. Vol. II, at 148-149.) He admitted that the two textbooks he identified as being authoritative — the Podiatrist Institute Manual and McGlamry's Textbook — do not indicate that a polar pack operating at 47 to 50 degrees can cause frostbite. (Tr. Vol. II, 151-152.)
 {¶ 27} At the close of plaintiffs' case, defendant moved for a directed verdict which the trial court denied.
 {¶ 28} Defendant called to the stand Dr. Leslie Geddes, who is Professor Emeritus in Biomedical Engineering at Purdue University. Dr. Geddes had been asked to test the Breg Polar Care 300. He performed two tests on the Breg device and graphed the results.
 {¶ 29} The first test Dr. Geddes called the "bench test" because the temperature of the Breg pad or cuff is tested with a thermometer as it lay on the bench as opposed to it being applied to a human subject. Dr. Geddes found that, on the bench test, the pad or cuff reached a temperature of 39 degrees after the device had been running about 50 to 60 minutes. According to Dr. Geddes, based on the bench test, 39 degrees is the lowest temperature that the Breg device can produce at the pad or cuff.
 {¶ 30} For the second test, Dr. Geddes used himself as the subject, securing the pad or cuff to his own foot and ankle. In this second test, Dr. Geddes placed the Breg pad directly on his skin with no layer of gauze or dressing between his skin and the pad. The reason for applying the Breg pad directly to his skin was to find the lowest temperature that the Breg device could produce to the skin. The lowest temperature produced during the second test was about 48 degrees which is within the Breg temperature specification of 47 to 50 degrees.
 {¶ 31} Defendant then called to the stand Robert Pozos, Ph.D., who is a professor of Physiology at San Diego State University. Dr. Pozos has a Ph.D in physiology and bio-engineering. He conducted experiments at the Hypothermia Laboratory at the University of Minnesota School of Medicine. He also worked at the San Diego Naval Health Research Center where he was involved in the development of cold and hot weather laboratories which assist the United States Marines in preparation for hot or cold combat. Dr. Pozos was the editor of a section of the Textbook of Military Medicine that deals with aspects of human performance in cold environments.
 {¶ 32} Dr. Pozos testified that, by definition, frostbite involves freezing of tissue. There are also nonfreezing cold injuries involving chronic exposure to cold. A nonfreezing cold injury can occur with temperatures in the 40 to 60 degree range. Dr. Pozos testified to a reasonable degree of certainty based upon his training as a physiologist that Tammy did not suffer frostbite. He opined that she did suffer from a nonfreezing cold injury.
 {¶ 33} Dr. Pozos further testified that, for frostbite to occur, the temperature must be 32 degrees or colder. Dr. Pozos also presented to the jury several photographs that he has shown to first responders to demonstrate the different degrees of frostbite injuries that can occur.
 {¶ 34} Dr. Pozos viewed the photograph of Tammy's left foot. He explained and opined that there is nothing in the photograph to suggest frostbite. Dr. Pozos opined to a reasonably degree of scientific certainty, based upon the photographs of Tammy's left foot, that Tammy suffered a "superficial non-freezing cold injury and did not suffer frostbite." (Tr. Vol. III, at 235.) He further opined that her injury was caused by the polar pack circulating water between 47 to 50 degrees.
 {¶ 35} Following the close of defendant's evidence and the court's instructions to the jury, the jury rendered a verdict in favor of defendant and the trial court entered judgment on the verdict. Plaintiffs appealed the judgment to this court. Defendant cross-appealed, claiming that the trial court erred in denying his motion for a directed verdict.
 {¶ 36} Plaintiffs present their assignments of error as follows:
I. It was prejudicial and reversible error for the trial court to exclude certain testimony by plaintiffs' expert.
A. The trial court improperly precluded plaintiffs' expert, anthony polito d.p.m., from expressing his complete opinions concerning defendant's breach of the standard of care.
1. Plaintiffs' expert was properly qualified to render his opinion
2. Proper requisite basis for plaintiffs' expert had been established in the evidence.
 {¶ 37} We overrule plaintiffs' assignments of error, as more fully explained below.
 {¶ 38} Evid.R. 702 states in part:
A witness may testify as an expert if all of the following apply:
(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *
 {¶ 39} Evid.R. 104(A) states:
Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (B). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
 {¶ 40} Although Evid.R. 702 permits a witness to testify as an expert if his opinion or testimony will aid the trier of fact in search of the truth, a threshold determination must first be made in accordance with Evid.R. 104(A) concerning the qualification of the witness to testify as an expert. Bishop v.Ohio Bur. of Workers' Comp. (2001), 146 Ohio App.3d 772, 781, citing McConnell v. Budget Inns of Am. (1998),129 Ohio App.3d 615, 624. In determining the admissibility of an expert witness's testimony, the court must consider whether that witness will aid the trier of fact in search of the truth. In addition, a person may be qualified as an expert witness if the proponent of such witness can establish that the witness has knowledge of scientific, technical or other specialized information. Bishop,
supra. Such a witness may be qualified as an expert based on special knowledge, skill, experience, training, or education. Id. at 782. The determination of whether a witness possesses the qualifications necessary to allow his expert testimony lies within the sound discretion of the trial court. Id. Such a determination will not be reversed by an appellate court unless there is a clear showing of an abuse of discretion by the trial court. Id.
 {¶ 41} At issue here is the trial court's exclusion of Dr. Polito's proffered testimony that Dr. Janis fell below the standard of care in applying the Breg polar pack to Tammy's left foot. The dressing of the surgical wound was documented in Dr. Janis' operative report which Dr. Polito reviewed in preparation for his testimony. Dr. Polito opined that the number of plies of dressing placed by Dr. Janis' resident on the surgical site was insufficient to insulate the foot from the cold temperature produced by the Breg polar pack. That is, it was Dr. Polito's opinion that, had the resident placed sufficient dressing on the foot, the temperature produced by the Breg polar pack could not have caused the injury.
 {¶ 42} Dr. Polito failed to articulate the theory underlying his opinion that Dr. Janis fell below the standard of care in applying the polar pack — that polar pack application requires additional dressing to insulate the body from the cold temperature produced. While dressings are traditionally applied to prevent infection and to aid in the healing process, it was Dr. Polito's view that additional dressing was needed to provide insulation to protect the body part from the cold temperature produced by the polar pack.
 {¶ 43} It is clear from the record that Dr. Polito was not qualified as an expert to theorize that the polar pack must be insulated to prevent injury. There was no evidence that Breg instructs doctors using its polar pack to insulate it. Dr. Polito cited no authority from any standard medical textbook or published medical journal that indicates that a polar pack must be insulated when applied. Dr. Polito conducted no testing or experiments of his own that indicate that the Breg polar pack can cause injury unless it is insulated by additional surgical dressing.
 {¶ 44} Moreover, notwithstanding the unarticulated theory that the Breg polar pack or polar packs in general, require insulation in the form of additional dressing to prevent injury, it was Dr. Polito's view that the temperature that the Breg polar pack could produce was simply irrelevant.
 {¶ 45} Dr. Polito's view that temperature is irrelevant conflicts with his theory that the dressing must insulate the body part from the cold temperature produced by the polar pack. Moreover, while Dr. Polito ultimately opined that temperature is irrelevant, he nevertheless offered a multitude of conflicting opinions regarding the temperature produced by the Breg polar pack. It is abundantly clear that there was no authoritative basis for Dr. Polito's various opinions on temperature. As the trial court correctly observed "his answers to the questions regarding this particular device are pure speculation." (Tr. Vol. II, at 97.) Under such circumstances, Dr. Polito was clearly not qualified as an expert regarding the subject matter of polar pack application.
 {¶ 46} While Dr. Polito, as a licensed practicing podiatrist, may very well be an expert as to how a surgical site should be dressed to prevent infection and to generally facilitate the healing process, he was clearly not qualified as an expert to present an opinion that the application of a polar pack requires the insulating properties of the surgical dressing to prevent injury from the temperature produced by the polar pack. SeeBishop, supra (in a trial to establish the right to participate in the workers' compensation fund, a cardiologist was not qualified to testify that the stress experienced by plaintiff causing her myocardial infarction was greater emotional strain than that to which all workers are occasionally subjected).
 {¶ 47} Citing Evid.R. 703 and 705, plaintiffs contend that Dr. Polito should have been permitted to testify that Dr. Janis fell below the standard of care in the application of the polar pack based solely upon Dr. Janis' trial testimony. We disagree.
 {¶ 48} Evid.R. 703 states:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing.
 {¶ 49} Evid.R. 705 states:
The expert may testify in terms of opinion or inference and give his reasons therefore after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise.
 {¶ 50} As previously noted, at trial, Dr. Janis was called to the stand by plaintiffs as on cross-examination. Dr. Janis testified that he believed that the injury was frostbite when he examined Tammy's foot on May 12, 2000. He agreed with cross-examining counsel's statement that, if the polar pack is operating properly and the pad is applied properly, the patient should not get frostbite. He agreed that he had no information that Tammy had misused the polar pack. He agreed that he had no information that the polar pack itself had malfunctioned.
 {¶ 51} During his direct examination at trial, Dr. Polito testified that it was his belief that the Breg device had not malfunctioned and that Tammy had not misused the polar pack. The basis for those beliefs was not disclosed by Dr. Polito but, presumably, they are based upon Dr. Janis' cross-examination testimony. Based upon those beliefs, plaintiffs' counsel asked Dr. Polito whether he had an opinion as to whether the polar pack was applied "appropriately at the time of her surgery." (Tr. Vol. II, at 138-139.) Defense counsel's objection to the question was sustained by the trial court.
 {¶ 52} According to plaintiffs, Evid.R. 703 and 705 required the trial court to overrule defendant's objection and to permit Dr. Polito to testify that Dr. Janis fell below the standard of care based solely upon Dr. Janis' own trial testimony. We disagree.
 {¶ 53} Again, Evid.R. 702(A) states that a witness may testify as an expert if the testimony either "relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons." In effect, Dr. Polito's excluded opinion is nothing more than an inference that he drew from Dr. Janis' testimony. We do not agree that the inference is valid nor do we find that it takes an expert to draw it. We do not agree that a so-called expert should be permitted to opine that the defendant fell below the standard of care based solely upon the presumed elimination of patient misuse and machine malfunction.
 {¶ 54} As we previously explained, Dr. Polito was not qualified as an expert regarding a need to insulate the polar pack with additional dressing. Given his lack of expertise in that area, he had nothing to offer the jury as to inferences that might be drawn from Dr. Janis' testimony.
 {¶ 55} Accordingly, we overrule plaintiffs' assignments of error.
 {¶ 56} Because we overrule plaintiffs' assignments of error, we find the assignment of error raised by defendant on his cross-appeal to be moot and on that basis, it is overruled.
 {¶ 57} All assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Klatt and Sadler, JJ., concur.